UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JEREMY C. NIEHART, | CASE NO. 1:12CV1252 |
| Plaintiff, | JUDGE CHRISTOPHER A. BOYKO |
| v. | Magistrate Judge George J. Limbert |
| CAROLYN W. COLVIN[1], ACTING COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE** |
| Defendant. | |

Jeremy C. Niehart ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying his application for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the decision for reevaluation and further analysis and application in accordance with the treating physician's rule.

**I.     PROCEDURAL AND FACTUAL HISTORY**

On March 4, 2009, Plaintiff applied for SSI alleging disability due to an anxiety disorder beginning on September 5, 1994, when Plaintiff was six years old. ECF Dkt. #10 ("Tr.") at 110.[2] The SSA denied Plaintiff's application initially and on reconsideration. Tr. at 54-57. Plaintiff

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2] References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

requested an administrative hearing, and on January 27, 2011, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and Bruce Holderead, an impartial vocational expert ("VE"). Tr. at 26-53. Plaintiff filed a request for review, which was denied by the Appeals Council on November 23, 2011. Tr. at 5-7.

On May 17, 2012, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On October 15, 2012, with leave of the Court, Plaintiff filed a brief on the merits. ECF Dkt. #11. On November 29, 2012, Defendant filed a brief on the merits. ECF Dkt. #12. Plaintiff filed a reply brief on December 10, 2012. ECF Dkt. #13.

## II.     SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff, who was twenty-two years old on the date of the hearing, suffered from panic disorder with agoraphobia, which qualified as a severe impairment under 20 C.F.R. §416.920(c). Tr. at 15. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§416.920(d), 416.925 and 416.926 ("Listings"). Tr. at 15.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: Plaintiff requires a routine, predictable environment involving simple, repetitive tasks with occasional and superficial interaction with others. He should work independently, but can occasionally relate to co-workers and to public in a superficial manner. Tr. at 17.

The ALJ ultimately concluded that, although Plaintiff had no past relevant work, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including that of store laborer, hospital cleaner, and laundry worker. Tr. at 20. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

### III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). When substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.2001). Thus, the ALJ has a " 'zone of choice' within which he can act without the fear of court interference." *Id.* at 773.

## V.     ANALYSIS

Plaintiff advances two arguments in this appeal. First, Plaintiff contends that the ALJ's decision was not supported by substantial evidence because she did not give controlling weight to the opinion of Plaintiff's treating physician and did not articulate good reasons for rejecting the treating physician's opinion, as required by the Sixth Circuit. Second, Plaintiff contends that the ALJ erred in not crediting Plaintiff's testimony at the hearing.

### A.     Medical history

Plaintiff was nineteen years old when he filed his application for SSI. He completed his high school education online in 2006. His earnings record shows no work activity, although he did attempt to work on three occasions. Tr. at 36-42. He alleges disability due to his anxiety disorder, which is triggered when he must leave his house and when he is around large groups of people. Tr. at126. According to Plaintiff, he "freeze[s] up when [he] does something or ha[s] to do something and [his] body will make itself sick." Tr. at 240. He develops a rapid heart beat, and gets flushed, anxious, and nervous. Plaintiff's family submitted statements to the record describing their observations regarding the lifelong difficulty he has experienced when apart from his parents and away from his home. Tr. at 169-174.

Plaintiff began treatment for his anxiety disorder when he was in the fourth or fifth grade at the Applewood Center ("Applewood"). Plaintiff took various medications, which initially controlled his symptoms, however, the effectiveness of each of the medications waned over time. With treatment, Plaintiff was able to intermittently attend school up until the eleventh grade, when he withdrew from the public school and completed his course work on line. Tr. at 240.

In 2006, when Plaintiff reached the age of eighteen, he began treatment at the Nord Center ("Nord"). During his initial screening at Nord, Plaintiff reported anxiety around large groups of people but that he wanted to overcome his anxiety in order to to be able to get a job and attend school at Lorain County Community College. Tr. at 264. He was diagnosed with Social Phobia and assessed a Global Assessment of Functioning ("GAF") score[3] of 60. Tr. at 218.

Medical records from Nord show visits with Kancherla Rao, M.D., Plaintiff's treating physician, and a case manager, Teresa Merriweather. Tr. at 275, 279. The notes further establish that prescribed medications successfully controlled Plaintiff's panic attacks and Plaintiff was encouraged to engage in activities outside of his home and to interact with friends. Tr. at 279, 273. When Plaintiff was able to achieve better control of his panic attacks, he could occasionally attend a family function and he hoped to be able to get a job eventually. Tr. at 271.

In January of 2009, Plaintiff's mother called the case manager and reported increased social isolation. Tr. at 234. Although he enrolled at the community college, Plaintiff was unable to attend classes due to panic attacks with vomiting and chest pain. Tr. at 232. Dr. Rao changed Plaintiff's medication in an effort to control his anxiety and lessen the side effects he was experiencing. Tr. at 233.

On June 11, 2009, Plaintiff was evaluated by psychologist Thomas F. Zeck, Ph.D. at the request of the Bureau of Disability Determination ("BDD"). Dr. Zeck diagnosed Generalized

---

[3]A GAF score is based upon a numeric scale (zero through one-hundred) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living. A score of fifty-one to sixty indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

Anxiety Disorder with agoraphobia and observed that, "[Plaintiff] seems to shy away from any involvement with others, has low confidence in himself and is unable to keep a job at this time." Tr. at 244. Dr. Zeck found that Plaintiff is moderately to markedly impaired in his abilities to relate to others including fellow workers and supervisors and in his ability to withstand the stress and pressure associated with a day to day work activity. He assigned a GAF score of 50. Tr. at 244.

On July 1, 2009, Tasneem Khan, Ed.D. reviewed the record for the BDD and agreed that Plaintiff suffers from Generalized Anxiety disorder with agoraphobia. Tr. at 252. He assessed Plaintiff's difficulties in maintaining social functioning and maintaining concentration, persistence or pace as moderate. Tr. at 257. This assessment was based largely upon the findings in Dr. Zeck's report, although Dr. Khan rejected Zeck's conclusion that Plaintiff was markedly impaired in his ability to work based upon Plaintiff's alleged statement that he had driven to the Zeck exam by himself. However, Plaintiff's alleged statement was later repudiated at the hearing. Tr. at 91-92, 105. Dr. Khan concluded that Plaintiff could perform work in a routine and predictable environment involving simple repetitive tasks with occasional and superficial interaction. Tr. at 318.

On November 22, 2009, Bonnie Katz, Ph.D. reviewed the record from Applewood beginning in August 2006 and noted that Plaintiff was able to interact with small groups of friends, although he continued to have difficulty with large crowds of people, and that medication helped him tolerate groups of people. She also reviewed statements from family members and concluded that they were in conflict as to whether Plaintiff was able to visit a friend's house. She concluded that a work environment with routine, predictable and simple tasks would be adequate to accommodate Plaintiff's difficulty being in large groups of people. Tr. at 284-285.

On December 2, 2010, Dr. Rao completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). Tr. at 286-288. He reported that Plaintiff is able to understand, remember and carry out instructions, with some impairment in his ability to concentrate and carry out detailed instructions. He further reported that Plaintiff has a marked impairment in his ability to interact appropriately with the public and co-workers, respond appropriately to work pressures and changes in a routine work setting, and that he is moderately impaired in his ability to interact appropriately with supervisors. Dr. Rao described marked difficulties in maintaining social

functioning and repeated episodes of deterioration or decompensation in work like settings which cause him to withdraw from the situation. He explained that Plaintiff was unable to attend high school or college and had to withdraw from community college on two occasions due to phobic anxiety. Dr. Rao further explained that Plaintiff had been hired to work the night shift at Wal-mart but quit after one night of orientation due to anxiety. Tr. at 287. Dr. Rao wrote:

> Patient has shown some improvement overall and no longer has panic attacks but continues to experience social anxiety especially in unfamiliar situations and consequently his efforts to take classes at a local community college and to go to work failed and it is my professional opinion that he is unable to work on a sustained basis at this time.

Tr. at 288.

### B. Plaintiff's testimony at the hearing

At the hearing, Plaintiff testified that his anxiety prevented him from attending high school. He is very uncomfortable in groups of people. He vomits and gets severe chest pain. Tr. at 32. Because Plaintiff was unable to attend the school, he completed his high school education by attending classes on line. He met with a tutor at his home once a week and that was the only interaction he had with the school. Tr. at 33.

From the age of eighteen to the present, Plaintiff has treated with Dr. Rao and Ms. Merriweather at Nord. Tr. at 35. Plaintiff sees Dr. Rao every three months. Plaintiff is currently prescribed Trileptal and Effexor. Tr. at 34. Although medication "seems to calm [him] down a little bit," it has been ineffective during his efforts at employment. Tr. at 35. Plaintiff has a drivers' license but has only driven on one occasion. Tr. at 36. Plaintiff testified that he did not drive to his consultative examination with Dr Zeck.[4] Tr. at 37.

Plaintiff attempted to work on three separate occasions. Plaintiff worked part-time in his father's construction and home repair business for about a year but he was able to be productive only when his father was present. Tr. at 42-43. Plaintiff explained, "I'd only talk to [my father] though, like, if someone else came in I just acted like I was doing something or actually working and just

---

[4]At the conclusion of Plaintiff's testimony, his counsel proffered testimony from his mother that she had driven him to Dr. Zeck's examination. The ALJ stated that she accepted that his mother drove him to the exam. Tr. at 50.

ignore the both of them." Tr. at 43. He further explained that, when his father would leave the job site, he would "just sort of lock up because [he] didn't really know what [he] was doing and after a few minutes [he'd] just try to go find out where [his father] went." Tr. at 43. When Plaintiff was asked why he left his father's employ, he responded, "I think, I'm not sure what happened with that – I don't know, I think it had to do with – he had other employees and he was paying them, and they knew they had to – they knew what they were doing, I was just pretty much there to help." Tr. at 42.

From January to March of 2008, Plaintiff worked as a meter reader for the City of Amherst, but was comfortable only when he was accompanied by his mother. Tr. at 44, 127. In 2010, Plaintiff applied for a stocking job at Wal-mart working the night shift. Tr. at 38. He was able to work only one or two days because he began to have panic attacks, including vomiting. Tr. at 38, 41. When asked to describe the cause of his anxiety at Wal-mart, he responded, "I was – just everything, what I had to do, the fact that if I did have to, I'd have to drive back and forth[5] and just the amount of people there." Tr. at 39. He continued, "I had to check all the – everything on the milk and stuff because I was the dairy – re-stocking dairy, so I had to check the dates, I had to replace things, the dates that would expire sooner would have to be put up closer and I think – I also had to study on the computer and everything just started coming to mind and there was a lot of stuff to do." Tr. at 39.

The VE testified that an individual with limitations that require routine, predictable environment, simple, repetitive type tasks, should not work in a group, should work more independently, should not have more than occasional and superficial interaction with coworkers and the public would be able to perform the jobs of store laborer, cleaner and laundry worker II. Tr. at 51-52. He further testified that the impairments described by Plaintiff during the hearing regarding difficulty relating to others, getting out in public, pretty much stays in, only goes out with family, has panic attacks in which he feels chest pain, vomiting, feels like heart attack and tends to isolate and stay away from people would preclude all work. Tr. at 52.

---

[5]Plaintiff appears to mean that he had to travel back and forth to work. It appears that his mother drove him to Wal-mart on the two days that he worked there.

### C. The ALJ's decision

The ALJ rejected Plaintiff's contention that he cannot be around large groups of people and gets sick if he goes outside his home based upon several facts from the record. First, in June of 2008, when Plaintiff was 18 years of age, he visited a crowded casino with his father. Medical notes from Applewood establish that Plaintiff told his doctor that he was so preoccupied with the slot machines that he was not aware of the large crowd of people surrounding him, and that he experienced no anxiety symptoms at all. Tr. at 203. Two months later, he reported that, if he limited the number of people with him to small groups, he did not experience any anxiety. Tr. at 202. In October of 2006, he reported that his medication was helping him cope with being in large groups of people. He stated that he experienced no anxiety at all. Tr. at 209. In August of 2009, Plaintiff told Dr. Rao that he felt comfortable at a large family gathering and wanted to get a job when he was able. Tr. at 271. The ALJ also wrote that Plaintiff "stated that he drove to visit his grandmother on a regular basis," Tr. at 18, however, the ALJ provided no citation to the record.

Although the ALJ gave limited weight to Dr. Zeck's conclusion that Plaintiff was markedly limited in his ability to deal with people and stress in the workplace, she nonetheless credited Dr. Zeck's observations that Plaintiff is an individual "who tends to give up easily and is not willing to take a risk. [Plaintiff] does not believe in himself and has poor self-esteem and confidence." Tr. at 18. The ALJ further cited Dr. Zeck's opinion that Plaintiff " 'is probably able to be more successful than what he thinks he can be.' " Tr. at 18. The ALJ concluded that Plaintiff's activities are "self-limited" because "no treating physician ha[d] instructed Plaintiff to refrain from any activity because of his mental impairment." Tr. at 18. Finally, the ALJ characterized Plaintiff's motivation to work and attend school as "questionable" because he was able to complete his high school education on the computer and is able to attend regular doctor appointments[6] and family functions. Tr. at 18.

The ALJ gave significant weight to the opinions of state agency file-reviewing consultants, Drs. Khan and Katz, who both concluded that Plaintiff could perform work in a routine and predictable environment involving simple, repetitive tasks with occasional and superficial

---

[6]There are several incidences in the record where Plaintiff did not show up for medical appointments. See Tr. at 235, 270, 278.

-9-

interaction. Although he gave significant weight to the opinions of Drs. Khan and Katz, he nonetheless concluded that Plaintiff is more limited in his activities of daily living and social functioning than Drs. Khan and Katz had concluded. Tr. at 18. As previously stated, the ALJ gave limited weight to Dr. Zeck's opinion, particularly his assignment of a GAF score of 50, since Dr. Zeck noted that Plaintiff showed no signs of anxiety. Tr. at 19. Finally, the ALJ gave limited weight to the opinion of treating physician, Dr. Rao, because she concluded that Dr. Rao's findings were inconsistent with the medical findings. The ALJ wrote:

> Dr. Rao noted improvement with [Plaintiff's] treatment, with abatement of panic attacks, but opined that [Plaintiff] has "marked" limitation interacting appropriately with the public and co-workers, and responding appropriately to work pressures and changes in a usual work setting. Furthermore, Dr. Rao consistently assigned [GAF] scores of 55, indicating only moderate limitation, rather than marked limitation.

Tr. at 19. The ALJ ultimately concluded that her residual functional capacity assessment was supported by Drs. Khan and Katz, and "to a limited degree" by Drs. Zeck and Rao. Id.

### D. Treating physician rule

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985). When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature,

and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, __ F.3d __, 2013WL896255, *9 (6th Cir. March 12, 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

In the case sub judice, the opinion of Dr. Rao was not afforded controlling weight because the ALJ concluded that his opinion was "inconsistent with the medical findings." Tr. at 19. As stated previously, the ALJ based her conclusion on the fact that Dr. Rao reported that Plaintiff's panic attacks had abated, and that Dr. Rao consistently assigned a GAF score to 55, which indicates only moderate, rather than marked, limitations.

Plaintiff argues that Dr. Rao's medical notes and Plaintiff's testimony at the hearing established that, although he had fewer panic attacks when taking his medication, his medication provided no relief from his other symptoms when he attempted to work. Furthermore, Plaintiff cites SSR 11-2p for the proposition that moderate impairment in functioning does not necessarily indicate an ability to work. SSR 11-2p, captioned "Documenting and Evaluating Disability in Young Adults," reads, in pertinent part:

> [P]sycosocial supports and highly structured or supportive settings may reduce the demand on a young adult and help him or her function. However, the young adult's ability to function in settings that are less demanding, more structured, or more supportive than those in which people typically work does not necessarily show how the young adult will be able to function in a work setting.

Plaintiff further contends that the ALJ's decision to give significant weight to the opinions of Drs. Khan and Katz was an error because Dr. Khan specifically relied upon the fact that Plaintiff had driven himself to his examination with Dr. Zeck (a fact directly contradicted at the hearing). Dr. Khan specifically observed that Dr. Zeck's conclusions are "not entirely consistent with the MER and ADLs in Plaintiff's file. Dr. Khan wrote:

> [Dr. Zeck] concluded that [Plaintiff's] ability to withstand the stress and pressures of day to day work [sic] and that his ability to relate to others is markedly impaired. The MER in file does not support the severity of these conclusions. [Plaintiff] was able to drive himself to the exam and was cooperative. He spends time with cousins and friends and reported feeling better with a medication change. There is no evidence of a period of decompensation due to problems [with] stress tolerance, Therefore, [Dr. Zeck's] conclusions regarding these areas are given little weight. [Plaintiff's] statements appear only partially credible. He denied driving on the ADL form and TP denied that [Plaintiff] drives, yet he drove to the CE appointment.

Tr. at 267. Finally, Plaintiff argues that neither Dr. Khan nor Dr. Katz had the opportunity to review the physician's notes of Dr. Rao.

The Sixth Circuit recently addressed the application of the treating physician's rule in *Gayheart*, supra. The Court acknowledged that an ALJ may give less than controlling weight to the opinion of a treating physician where the opinion is not well-supported by any objective findings or it is inconsistent with other substantial evidence. *Gayheart* at *10. Of particular interest to the issues presented in the above-captioned case, the Sixth Circuit observed that the ALJ's assertion in *Gayheart* that the plaintiff's ability to perform certain activities occasionally constituted evidence

that the plaintiff was able to perform those activities on a sustained basis. The *Gayheart* Court wrote:

> The record, according to the ALJ, is clear that Gayheart's "alleged anxiety has not prevented him from leaving home, driving, keeping medical appointments, visiting friends and neighbors, shopping with his wife, and attending three hearings." Although not clearly stated, the apparent implication is that these activities are inconsistent with the social and daily living restrictions noted in [the treating physician's] opinions.
>
> But the ALJ does not contend, and the record does not suggest, that Gayheart could do any of these activities on a sustained basis, which is how the functional limitations of mental impairments are to be assessed. See 20 C.F.R. §404.1520a(c)(2); 20 C.F.R. Part 404, Subpart P, Appendix 1, at 12.00 ("Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals."). Gayheart's ability to visit his aunt and uncle, who live on his street, and to receive occasional visits from his neighbor does not undermine [the treating physician's] opinion that Gayheart's ability to interact independently and appropriately with others on a sustained basis is markedly impaired. The same is true of his ability to accompany his wife on grocery-shopping trips once per month. These activities would be relevant if they suggested that Gayheart could do something on a sustained basis that is inconsistent with [the treating physician's] opinions. But they do not.
>
> Furthermore, many of these examples are either taken out of context or are offset by other examples in the record. Although it is accurate to say that Gayheart can drive, for instance, the record also shows that driving triggers his anxiety and that he thus relies on his wife to do most of the driving. Gayheart is likewise able to travel, but the record indicates that he generally avoids travel and that the one out-of-state trip he took in the three years prior to his testimony resulted in a panic attack. Nothing in the record suggests that he has left the house independently and on a sustained basis. Gayheart testified, in fact, that he had not gone to a store by himself in more than a year. We therefore conclude that the ALJ's focus on isolated pieces of the record is an insufficient basis for giving [the treating physician's] opinions little weight under 20 C.F.R. §404.1527(c).

*Id.* at 11. The Court further observed:

> Similarly, the ALJ does not identify the substantial evidence that is purportedly inconsistent with [the treating physician's] opinions. Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id.* at *10.

Here, the ALJ, like the ALJ in *Gayheart*, appears to have rejected the treating physician's opinion based largely upon of handful of isolated activities that Plaintiff has engaged in over the

-13-

course of several years.  Moreover, the ALJ failed to consider that Plaintiff's GAF score was assessed when Plaintiff was not working.  Finally, the ALJ appears to have credited the opinions of the consulting physicians based upon the same handful of isolated activities.

As the Sixth Circuit observed in *Gayheart*, "In the end, a proper analysis of the record might not support giving controlling weight to the opinions of [the treating physician]," however, "even if [the treating physician's] opinions do not warrant controlling weight, they still must be weighed as the regulations prescribe. . ."  *Gayheart* at 14.  The same is true here.  Accordingly, the undersigned recommends that the Court find that the ALJ violated the treating physician's rule by failing to articulate "good reasons" for giving only limited weight to the opinion of Dr. Rao.

### E.    The ALJ's credibility determination

Turning to Plaintiff's second argument, an ALJ may discount a claimant's credibility where the ALJ finds contradictions among the medical records, claimant's testimony, and other evidence.  *Walter,* 127 F.3d at 531.  "It [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir.2001), quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir.1972).  Nevertheless, an ALJ's credibility determinations regarding subjective complaints must be reasonable and supported by substantial evidence.  *Rogers,* 486 F.3d at 249.

As previously stated, the ALJ's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* supra. Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a judgment as a matter of law if this case were being tried to a jury.  *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir.1988) (citing *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939)).

Once again, the ALJ appears to have predicated her credibility determination on the handful of activities undertaken by Plaintiff and identified at page eighteen of her Decision.  As previously stated, the ALJ has relied upon these activities despite the fact that there is no evidence in the record to conclude that Plaintiff is capable of performing these activities on a sustained basis.  Accordingly,

-14-

the undersigned recommends that the Court find that the ALJ's credibility determination is not supported by substantial evidence.

### VI. CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the decision for reevaluation and further analysis in accordance with the treating physician's rule.

DATE: March 22, 2013

        */s/George J. Limbert*
        GEORGE J. LIMBERT
        UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).